UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

———————————————————————

NEW CINGULAR WIRELESS PCS, LLC,

                                               No. 3:11-CV-510 (ATB)

                       Plaintiff,

          v.

TOWN OF FENTON and
ZONING BOARD OF APPEALS OF FENTON,

                     Defendants.

———————————————————————

For Plaintiff:       KEVIN M. HOGAN, ESQ.,
                     MORGAN G. GRAHAM, ESQ., and
                     SUSAN M. MARRIOTT, ESQ.

For Defendants:   ALBERT J. MILLUS, JR.,


ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE


**MEMORANDUM-DECISION AND ORDER**

     Presently before the court is plaintiff's motion, pursuant to Rules 52 and 58 of

the Federal Rules of Civil Procedure, for, *inter alia*, a judgment declaring that the

defendants violated the Telecommunications Act of 1996 (the "TCA"), 47 U.S.C. §

332, *et seq.*, and New York law, by denying plaintiff's application for a zoning use

variance to construct and operate wireless telecommunications equipment in the Town

of Fenton, New York.[1]  On August 12, 2011, the parties stipulated to the administrative record upon which the court could render judgment.  (Dkt. Nos. 17, 19, 35).  On October 7, 2011, plaintiff filed the instant motion, as well as a supporting attorney affidavit, memorandum of law, and proposed findings of fact and conclusions of law.  (Dkt. Nos. 22-24).  The defendants filed an attorney affidavit, memorandum of law, and proposed findings of fact and conclusions of law in opposition to plaintiff's motion in November 2011.  (Dkt. Nos. 27-29, 31).  Plaintiff filed a reply brief on December 5, 2011 (Dkt. No.  34), and on December 19, 2011, the court conducted oral argument and permitted closing statements by both sides.

Based on the administrative record, the submissions of the parties, and the arguments of counsel, the court finds that the denial of plaintiff's use variance by the Town of Fenton Zoning Board of Appeals ("ZBA") was not properly based on a written decision supported by substantial evidence in the record, contrary to both the TCA and New York law.  Further, the ZBA's denial had the effect of prohibiting plaintiff from remedying a gap in its cellular telephone coverage in and around the Town of Fenton, also in violation of the TCA.  Accordingly, the court orders, *inter alia*, that the defendants promptly approve plaintiff's zoning use variance and issue all other permits required by plaintiff to place, construct and operate its proposed cellular telecommunications facility in the Town Fenton.  The following constitutes the court's supporting findings of fact and conclusions of law, as required by Fed. R. Civ. P. 52.

---

[1] On July 25, 2011, Hon. Mae A. D'Agostino, U.S. District Judge, referred this case to me to conduct all proceedings, including the entry of judgment, based on the consent of all parties to the exercise of jurisdiction by a U.S. Magistrate Judge.  (Dkt. No. 15).

## I.  FINDINGS OF FACT[2]

Plaintiff New Cingular Wireless PCS, LLC is a foreign limited liability company authorized to do business in New York.  AT&T Mobility Corporation ("AT&T")  is New Cingular's manager.[3]  Defendant Town of Fenton is a municipal corporation located in Broome County, New York.  The Town of Fenton Zoning Board of Appeals ("ZBA") is the town's duly constituted zoning board of appeals, established pursuant to New York Town Law § 267.

A significant gap in AT&T's wireless telecommunications service exists in and around the Town of Fenton.  In an effort to remedy this service gap, AT&T proposed to construct and operate, *inter alia*,  a telecommunications facility–a 150-foot cellular telephone tower–at 210 Steed Road in the Town of Fenton.  It is not disputed that AT&T's proposed facility would significantly improve telecommunication service coverage in both buildings and vehicles in the Town of Fenton and surrounding areas and, therefore, would adequately remedy AT&T's service gap.

On or about September 16, 2009, AT&T applied to the Fenton Town Board for the creation of telecommunications districts for the construction of the proposed facility along Steed Road, as well as a cellular telephone tower at a separate location along Palmer Hill Road.  On May 14, 2010, AT&T withdrew its Palmer Hill Road

---

[2] The analysis in Section II., below, includes further, specific factual findings that are relevant to resolving the key issues in dispute in this action, as well as citations to the administrative record supporting the critical factual findings.

[3] Following the convention followed by plaintiff's counsel, plaintiff will be referred to herein as "AT&T."

application.  On July 7, 2010, the Town Board denied AT&T's application to create the telecommunications district to accommodate the Steed Road site.

On August 26, 2010, AT&T applied to the ZBA for a use variance to allow the construction of the proposed tower at the Steed Road location.  In connection with the use variance application, AT&T made three substantial submissions to the ZBA, including affidavits from a radio frequency engineering expert, reports from a "balloon test" and photo-simulation consultant, and a report from a concealment technology expert.  On September 15, 2010, November 16, 2010, and April 5, 2011, the ZBA conducted extensive public hearings devoted to the issues raised by the use variance application.  During the three hearings, AT&T's representatives, including the radio frequency and concealment technology experts, testified in support of the variance.  Various neighbors and members of the public asked questions and made comments about the proposed facility.

As modified, in response to feedback from the ZBA and the community, AT&T's proposed facility on Steed Road would consist of a 150-foot "monopine" (a monopole concealed to look like a pine tree), with related equipment, located within a fenced compound on a large wooded lot.  AT&T's proposed facility would be well-screened from the surrounding community by the topography of, and the tall trees on, the Steed Road site.  The balloon test and photo simulations presented by AT&T's experts indicated that, from most vantage points within the surrounding community, the proposed facility would not be visible.  In the limited number of neighboring locations where the proposed facility would be visible, only the top portion of the

disguised "monopine" would be visible above the surrounding tree line.

During the ZBA's review process, AT&T engaged in a thorough technical evaluation of eleven alternative "solutions" to its service gap, suggested by the ZBA or other town officials.  AT&T considered five single-site alternatives, modifications to AT&T's existing facilities in another town, and five different two-site alternatives, evaluating the extent to which the various alternatives would remedy the service gap and/or would be visible to the surrounding community.  None of the single-site alternatives was capable from a technical perspective, of adequately remedying AT&T's service gap.  The only viable two-site solutions that adequately remedied AT&T's service gap would require the construction of two new 150-foot towers near existing power transmission lines–the "Power Line Solution."

AT&T's expert presented evidence indicating that the two separate towers required to implement the Power Line Solution would have a substantially greater visual impact on the surrounding community than the single-site facility proposed by AT&T.  Although the ZBA and some community members criticized the analysis of AT&T's expert regarding the visual impacts of the proposed facility and the Power Line Solution, the ZBA declined AT&T's suggestion that the ZBA engage its own expert, at AT&T's expense, to evaluate the technical issues relating, *inter alia*, to the visual impact of the various facilities under consideration.

At the conclusion of its meeting on April 5, 2011, the ZBA issued a negative "SEQRA" declaration, finding that AT&T's  proposed facility had no negative environmental impact.  At the same time, the ZBA also voted to deny AT&T's

application for the use variance.  On June 27, 2011, the ZBA provided plaintiff with a copy of a undated written decision supporting its denial of the use variance.

## II.   LEGAL ANALYSIS AND CONCLUSIONS OF LAW[4]

### A.   Overview of the Applicable Legal Framework

#### 1.   The Telecommunications Act of 1996

The Telecommunications Act of 1996 ("TCA") is "an omnibus overhaul of the federal regulation of communications companies," the purpose of which is to "provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services . . . by opening all telecommunications markets to competition. . . ."  *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 637 (2d Cir. 1999) (citations and internal quotations omitted).  "One of the means by which [Congress] sought to accomplish these goals was reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers."  *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 115 (2005).  "In section 332(c)(7) of the [TCA], Congress preserved the authority of state and local governments over zoning and land use issues, but imposed limitations on that authority."  *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 101 (2d Cir. 2010).  The Supreme Court has explained the limitations of section 332(c)(7)

---

[4] The parties agree that there is subject matter jurisdiction over plaintiff's claims and that venue properly lies in the Northern District of New York.  There is no dispute that the TCA applies to AT&T and its application for a use variance to construct the proposed facility.  (Pltf.'s Proposed Conclusions of Law ¶¶ 1-6, Dkt. No. 23 at 6-7; Deft.s' Proposed Conclusions of Law, ¶¶ 1-6, Dkt. No. 29 at 3-4).

that are relevant to this action:

> Under this provision, local governments may not . . . take actions that "prohibit or have the effect of prohibiting the provision of personal wireless services," § 332(c)(7)(B)(i)(II) . . . . They must act on requests for authorization to locate wireless facilities "within a reasonable period of time," § 332(c)(7)(B)(ii), and each decision denying such a request must "be in writing and supported by substantial evidence contained in a written record," § 332(c)(7)(B)(iii).

*City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. at 116.

### 2.    Applicable State and Local Law

### a.    Standard of Review for Local Zoning Decisions

When a town renders a decision on a use variance application, it must comply with New York Town Law § 267-a(9), which requires the ZBA to file a written decision in the office of the town clerk within five business days after the decision is rendered, and to mail a copy of the decision to the applicant. New York Civil Practice Law and Rules, Article 78, affords relief from local zoning (or other) decisions that are "affected by an error of law," are "arbitrary and capricious," or are not supported by "substantial evidence." N.Y.C.P.L.R. § 7803(3) & (4).

The Second Circuit has summarized the substantive provisions of New York State zoning law that would apply both to plaintiff's state law claim and to its TCA/substantial evidence claim:

> In New York, cellular telephone companies are afforded the status of public utilities. . . .  As such, a cellular telephone company's application for a variance must be judged by [a] Town Board on a different standard than that applied to the usual application for a use variance. . . . Rather than granting a variance only on a showing of "unnecessary hardship," a local zoning board must consider whether the public utility has shown "a need for its facilities" and whether the needs of the broader public would be served by granting the variance. . . .

However, aesthetic concerns can be a valid basis for zoning decisions. *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999) (citations omitted).

### b.   Town of Fenton Zoning Requirements

Pursuant to § 261 of New York Town Law and Municipal Home Rule Law, a town has the authority to adopt zoning regulations that govern, among other things, the location and use of buildings, structures and land for trade, industry or other purposes.  Pursuant to this authority, the Fenton Town Board enacted Chapter 150 of the Town Code ("Zoning Code"), to regulate the use of land and the location, use and occupancy of buildings within the town.  The Zoning Code prohibits telecommunications facilities anywhere in the town except in approved telecommunications districts.  Zoning Code § 150-20.6(A).  In order to construct and operate a wireless telecommunications facility in the town, a wireless service provider must select an appropriate location in which to construct such a facility and then either obtain a telecommunications district designation from the Town Board or obtain a use variance from the Town ZBA.  (R. 4, 49).[5]

### B.   The ZBA's Denial of Plaintiff's Use Variance

At the conclusion of the April 5, 2011 hearing, the ZBA issued a negative

---

[5] As noted above, plaintiff first applied for a Telecommunications Zoning District that would accommodate its proposed facility.  When the Town Board denied that application, plaintiff the sought a use variance from the ZBA, the denial of which is the subject of this action. (Deft.s' Mem. of Law at 3-7, Dkt. No. 28).  During the September 2010 hearing before the ZBA, AT&T's counsel discussed the different legal standards applicable to the Town Board process and explained why AT&T sought a use variance from the ZBA, rather than pursuing judicial review of the Town Board's denial.  (R. 247-248).

SEQRA declaration, finding that the proposed facility had no negative environmental impact.  (R. 494-495).  *State Environmental Quality Review Act (SEQRA)*, N.Y. Envtl. Conservation Law (ECL), Article 8.  The ZBA members present then proceeded to vote unanimously to deny plaintiff's application for a use variance, after which the Town Attorney reminded the board members that they were required to produce a detailed written statement of the reasons for the denial.  (R. 499).  It was not until June 27, 2011, following a Freedom of Information Law Request and the filing of the instant action by AT&T, that the ZBA provided plaintiff with a copy of a undated written decision.  (Graham Aff. ¶¶ 19-20, Dkt. No. 24).  The "Decision" portion of the ZBA's written denial reads as follows:

> Pursuant to Town Code §150-45, The Town of Fenton Zoning Board of Appeals hereby denies the Use Variance.
>
> The Board considered all of the information as presented by AT&T and appreciated the additional data provided as requested.
>
> AT&T went to great lengths to refute the criticism of the balloon test.  The Chairman contested the accuracy of one photo and demonstrated a 60 degree variance relative to the actual proposed site.  At issue was less the ability to view the balloon than the amount of the error.  Similarly, for a technology that is reliant upon "line-of-sight", the ability to view the balloons was overwhelmingly and unrealistically absent.  While the stated position was that items such as cell towers tend to slip from view as an obvious structure or are not readily visible at extended distances, that opinion was not shared by the board or other town residents.  The expert review and subjective opinion expressed by Thor Holbek had limited merit since any judgment pertaining to alternate sites was based on the view from Google Earth.  The actual topographical features of the area would be of far greater impact in assessing various views.  Alternate Site One, as an example, faces an area of far greater commercial and vehicular activity – and also includes numerous singular tall pines if concealment technology were to be used for aesthetic blending.  The

board felt that placing a cell tower on the proposed site would have a negative
visual impact regardless of any attempt at concealment. Collocation is seen
effectively as an aesthetically neutral even since the site is already used for this
purpose.

While it was not the intent of the board to evaluate alternate sites, since they
were included in the data and discussion, there was good reason to include them
in the overall process. Alternate Site one is within a 45 acre parcel owned by
the People of the State of New York. Collocating on the county tower – while
reconstruction may be required – poses an opportunity to allow both to fall
within the Town's suggested guidelines for site selection preference. The single
proposed site seems to offer a superior statistical remedy to the service gap, but
a two-site solution that also offers a substantial percentage increases in
coverage area and satisfies the stated preference criteria should be considered.
A corporate entity that espouses "Rethink possibilities" might act on its own
credo.

An early inquiry pertaining to superceding technology was dismissed, with Mr.
Walters stating that nothing new was on the horizon and in any event a bond
would be posted for structure removal if that were ever deemed necessary. An
article published in the Press and Sun-Bulletin February 12, 2011 featured a
"light-radio cube" technology being demonstrated by Alcatel-Lucent which
offers a glimpse at replacing cell towers with less obtrusive designs. Wim
Sweldens, President of the wireless division of Alcatel-Lucent (successors to
the former AT&T Bell Labs) remarked, "We see more and more towers that
become bigger and bigger, and more and bigger antennas that come to obstruct
our view and clutter our landscape and are simply ugly".

Use variances are generally applied to specified uses within an established
zoning district. In this case, the mere issuance of a use variance would be the
default creation of a telecommunications district and such authority should
properly rest with the legislative powers of the town board. The code goes to
great lengths to define and specify all aspects and planning board involvement
in the process which should rightfully be included.

(R. 564-565).

Defense counsel conceded, at oral argument, that the ZBA could not justify its

10

denial of plaintiff's use variance on the possible availability of new, alternative cellular telephone technologies.[6]  Counsel previously instructed the ZBA that it could not deny AT&T's use variance based on the concern that the ZBA would intrude on the jurisdiction of the Fenton Town Board by approving a variance after the Town Board denied plaintiff's request to establish a telecommunication district to accommodate the proposed Steed Road facility.  (R. 247). [7]

## C.    Claims Based on the TCA's Requirement of a Written Decision Supported by Substantial Evidence

### 1.    Applicable Legal Standards

The TCA prohibits a municipality from denying an application for a wireless communications facility except in a written decision supported by substantial evidence.  47 U.S.C. § 332(c)(7)(B)(iii).  To determine whether a denial was supported by substantial evidence, courts "must employ 'the traditional standard used

---

[6] Plaintiff's brief persuasively argues why considerations of possible alternative, new technologies is not a valid basis for denying an otherwise meritorious application for a zoning variance to construct a cell tower.  (Pltf.'s Mem. of Law at 41-42, Dkt. No. 22 (citing *MetroPCS N.Y. LLC v. City of Mount Vernon*, 739 F. Supp. 2d 409, 423 (S.D.N.Y. 2010) (it was improper for the City to insist on the use of alternative technology because there was no evidence that MetroPCS's application was otherwise deficient); *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d at 105-107 (the TCA preempts a town statute setting forth a preference for installation of developing "microcell" or DAS technologies)).

[7] Plaintiff's brief also cogently explains why the ZBA could not avoid its responsibility to consider a proposed zoning variance merely because the Town Board had previously refused to create a telecommunication zoning district encompassing AT&T's proposed site.  (Pltf.'s Mem. of Law at 42-43, (citing, *inter alia*, *Omnipoint Communications, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 556-57 (S.D.N.Y. 2009) (instead of carrying out its responsibility to decide whether substantial evidence supported granting a variance from the requirements of the local zoning law, the ZBA simply fell back on the fact that a variance was required in order to deny it; the utterly absurd, completely circular "explanation" offered by the ZBA members for refusing a variance demonstrates that there was no reasoned basis in the evidence for their denial).

for judicial review of agency actions.'" *Cellular Tel. Co. v. Town of Oyster Bay*, 166

F.3d at 494 (citation omitted)).  As the Second Circuit has elaborated:

> This standard of review is deferential, and [a court] may neither engage in [its]
> own fact-finding nor supplant the Town Board's reasonable determinations. . . .
> Substantial evidence . . . has been construed to mean less than a preponderance,
> but more than a scintilla of evidence.  "It means such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion."  However,
> the record should be viewed in its entirety, including evidence opposed to the
> Town's view.

*Id.* (citations omitted).

While "[t]he TCA clearly establishes procedural requirements that local boards

must comply with in evaluating cell site applications[,]" the applicable substantive

standards to be applied are derived from the established principles of local and state

zoning laws.  *Id.*  These standards "ha[ve] been interpreted in the context of zoning

decisions for telecommunications facilities to require that '[a] telecommunications

provider that is seeking a variance for a proposed facility need only establish (1) that

there are gaps in service, (2) that the location of the proposed facility will remedy

those gaps and (3) that the facility presents a minimal intrusion on the community[.]'"

*New York SMSA Ltd. Partnership v. Village of Floral Park Bd. of Trustees*, __ F. Supp.

2d __, 09–CV–2385, 2011 WL 4375668, at *7 (E.D.N.Y. Sept. 19, 2011) (quoting *Site*

*Acquisitions, Inc. v. Town of New Scotland*, 2 A.D.3d 1135, 1137, 770 N.Y.S.2d 157,

160 (3d Dep't 2003) and citing *Omnipoint Commc'ns, Inc. v. City of White Plains*,

430 F.3d 529, 535 (2d Cir. 2005)).

It is settled in the Second Circuit that "local governments may reasonably take

the location of the telecommunications [facility] into consideration when deciding whether . . . to approve an application for construction of wireless telecommunications facilities. . . ." *Sprint Spectrum L.P. v. Willoth*, 176 F.3d at 639. In the context of a substantial evidence claim involving the public necessity standard applicable to utilities in New York, "the carrier must demonstrate not that the proposed facility was the 'least intrusive means' [to remedy the service gap] but rather that the proposed facility was 'more feasible than other options.'" *New York SMSA Ltd. Partnership v. Village of Floral Park Bd. of Trustees*, 2011 WL 4375668, at *17 (citing *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d at 535) (the "least intrusive means" standard applies, not to a substantial evidence claim under section 332(c)(7)(B)(iii) of the TCA, but to an effective prohibition under section 332(c)(7)(B)(i)(II)).

## 2.    The ZBA's Written Decision

The ZBA's belated written decision supporting its denial of plaintiff's application for a use variance was not a model of clarity and only vaguely referred to evidence in the record. As defense counsel has conceded, the decision relied upon several impermissible grounds.[8]   Furthermore, the ZBA ultimately conceded that plaintiff had established the existence of a gap in AT&T's coverage in the Town of Fenton, and that the proposed facility adequately remedied the service gap. (R. 499, 565; Deft.s' Mem. of Law at 1, Dkt. No. 28).

---

[8] "If 'the Court finds that even one reason given for the denial is supported by substantial evidence, the decision of the local zoning body cannot be disturbed.'"   *New York SMSA Ltd. Partnership v. Village of Floral Park Bd. of Trustees*, 2011 WL 4375668, at *8  (quoting *New York SMSA L.P. v. Town of Oyster Bay Zoning Bd. of Appeals*, No. 08–CV–4833, 2010 WL 3937277, at *4 (E.D.N.Y. Sept. 30, 2010)).

13

Counsel for the Town of Fenton did his best to interpret the ZBA's written decision to advance the most defensible basis for the denial.  Defense counsel argued that the ZBA denied plaintiff's use variance because the ZBA considered one of the proposed alternatives to remedy AT&T's service gap, consisting of a two-site solution at "Power Line Site #1" and "Power Line Site #2 " (the "Power Line Solution"), to be less-intrusive than the proposed Steed Road site.  The Power Line Solution was the only viable alternative to the proposed site that provided comparable coverage of AT&T's service gap in the Town of Fenton.  According to counsel, the ZBA made a judgment that two separate cell towers, located on land already scarred by power transmission lines, would be less visually intrusive than AT&T's proposed site, which was located in what the ZBA considered a particularly unspoiled and uncluttered area of the town.  (Deft.s' Mem. of Law at 1-2, 16).

The court finds, however, that the written decision of the ZBA cannot be fairly construed to advance defense counsel's justification for denial of the use variance.  The ZBA decision does commend an alternative to AT&T's proposed single site on Steed Road, but it clearly prefers, not the "Power Line Solution," as described above, but to another two-site alternative involving a co-location on property containing the existing County Tower and a new tower on Power Line Site #1.  (R. 565).[9]

---

[9] In the transcript of the last public hearing before the ZBA (at  pp. 44-45, 68-69), the Chairman makes clear that he prefers the two-site solution involving the County Tower and Power Line Site #1 because (1) the County Tower site allows for co-location on an existing facility, rather than construction of a tower in an undeveloped location and (2) Power Line Site #1 is located on property owned by New York State.  The Chairman expresses concerns about Power Line Site #2 because it is owned by individuals who are related to private owners of AT&T's proposed site.  (R. 490-491, 496-497).  Although the "Power Line Solution" (involving

14

During oral argument, defense counsel suggested that the following statement, in the ZBA decision, which was immediately preceded by the explicit discussion of the County Tower/Power Line Site #1 solution, should be construed to include support for the alternative Power Line Solution: "a two-site solution that also offers a substantial percentage increase in coverage area and satisfies the stated preference criteria should be considered [by AT&T]." (R. 565). This statement refers back to siting preferences in the Fenton Town Code, which rank, as the most desirable sites for structures such as cell towers, "(1) Property with an existing structure suitable for collocation" and (2) "Municipal- or government-owned property." (R. 564). Because, as explained in note 9, the County Tower site allowed for co-location, the Power Line Site #1 was located on state land, and Power Line Site #2 was owned by private individuals and thus, was a less desirable site under the Town Code, the quoted sentence from the ZBA decision is a further reference to the preferred County Tower/Power Line Site #1 alternative, not the Power Line Solution.

"The TCA requires a written decision to enable a reviewing court to analyze the zoning authority's rationale and to determine if the agency complied with the TCA's requirements." *Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 553-554 (S.D.N.Y. 2009) (collecting cases). "The law requires the ZBA to

---

new towers at both Power Line Sites #1 and #2) was discussed at the hearing and provided better coverage of the AT&T service cap in the Town of Fenton, only Mr. Ward–the nearest neighbor to the AT&T's proposed Steed Road site–expressed any explicit support for that particular two-site solution. (R. 487). This reinforces that the focus of the written ZBA decision on the County Tower/Power Line Site #1 solution reflected the ZBA's preference for that alternative, and not the Power Line Solution emphasized by defense counsel.

15

specify what its reasons were so that no one has to parse a record and guess which of the things mentioned therein was ultimately found persuasive." *Id*. ("'If the written decision does not set forth the zoning authority's rationale, this ground alone is sufficient to quash the [zoning authority's] decision.'") (citation omitted).

The ZBA's written decision identified only one alternative to AT&T's proposed single site–the two-site County Tower/Power Line Site #1 solution–and concluded that it was preferable because it achieved a substantial percentage increase in AT&T's existing coverage area, and because it complied with the siting preferences of the Town Code. (R. 565). In retrospect, it is apparent that the two-site alternative preferred by the ZBA does not adequately address AT&T's coverage gap compared to the proposed single site (R. 504; Pltf.'s Mem. of Law at 21); and defense counsel conceded as much at oral argument.[10] Counsel's argument that the ZBA based its denial on its purported preference for a different two-site solution–the Power Line Solution–appears to be a *post hoc* rationalization that cannot now be raised to defend the ZBA's action. *See, e.g., Nextel of N.Y., Inc. v. City of Mount Vernon*, 361 F. Supp. 2d 336, 342 (S.D.N.Y. 2005) (concerns about adverse aesthetic impacts not mentioned

---

[10] AT&T's experts reported that the proposed site on Steed Road would provide "in building" coverage of 88.1% and vehicle coverage of 98.9% in the service gap area. The ZBA's preferred two-site alternative, involving the County Tower and Power Line Site #1, would provide in-building coverage of only 69.1% and in-vehicle coverage of 94.8%. While that would offer a substantial improvement over AT&T's existing coverage–only 10.7% in-building coverage and 43.9% vehicle coverage in the gap area–it fell well short of the improvements in coverage that would be provided by AT&T's proposed site. The Power Line Solution, advanced by defense counsel in his brief, but not referenced in the ZBA's written decision, would provide 90.5% in-building coverage and 99.3% in-vehicle coverage, slightly better than AT&T's proposed single site. (R. 504).

in the City's written decision cannot be first raised in litigation) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (courts may not accept *post hoc* rationalizations for agency action)); *T-Mobile Northeast LLC v. Incorporated Village of East Hills*, 779 F. Supp. 2d 256, 272 (E.D.N.Y. 2011) (where the ZBA's written decision did not rely upon the availability of less intrusive technology as a justification for denial, that cannot serve as substantial evidence supporting the ZBA's decision).[11]

### 3.   Visual Impact of the Proposed Site

In its written decision, the ZBA noted that "the board felt that placing a cell tower on the proposed site would have a negative visual impact regardless of any attempt at concealment." (R. 565). The decision also noted criticisms of the AT&T experts who assessed the visual intrusiveness of the proposed facility by a balloon test and photographic simulations of the view of the proposed "monopine" cell tower from various surrounding locations. (R. 564-565). To the extent the written decision

---

[11] Even if the ZBA's decision could be interpreted as basing its denial on the finding that the Power Line Solution was a more feasible and/or less intrusive alternative to address AT&T's service gap than the proposed facility, that finding would not be supported by substantial evidence. As noted above, the substantive New York zoning law applicable to a "substantial evidence" claim under 47 U.S.C. § 332(c)(7)(B)(iii) turns on whether the proposed site was more "feasible" than other alternatives. *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d at 535. The court finds there was not substantial evidence supporting a finding that the Power Line Solution, which required the construction of two separate towers to achieve comparable coverage, would be more "feasible" than AT&T's proposed single site along Steed Road. To the extent the existence of a less "intrusive" alternative could defeat plaintiff's section 332(c)(7)(B)(iii) claim, there is not substantial evidence indicating that the Power Line Solution would be less intrusive, as discussed in Section II E., below. In any event, a denial on the basis that the Power Line Solution was more feasible or less intrusive than AT&T's proposed facility would constitute an effective prohibition of service, in violation of the TCA, 42 U.S.C. § 332(c)(7)(B)(i)(II), for the reasons discussed in Section II E.

reflects a finding by the ZBA that AT&T's proposed facility created more than a "minimal intrusion on the community," this court concludes that there is not substantial evidence in the record supporting that finding. *See Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d at 495 ("under the TCA, we can find that aesthetics qualify as a permissible ground for denial of a permit only if we can conclude that there was "more that a mere scintilla" of evidence . . . before the Board on the negative visual impact of the cell sites") (citation omitted).

The record reflects that AT&T went to considerable lengths to minimize the visual impact of its proposed facility. (R. 98-129, 419-421). The proposed site consists of a very large wooded lot (over 50 acres), which would allow AT&T to place the proposed facility deep in the woods, well set back from the limited surrounding development. (R. 24-26, 421-422, 443-448). The facility would be located well over 1,000 feet from the site's frontage on Steed Road, and a ridge line would block the view of the tower along Steed Road and further towards the east. (R. 24, 70).

### a.     The Balloon Test and Photo Simulations

To document the visual impact of the proposed facility, AT&T conducted a "balloon test" in May 2010. A balloon, three feet in diameter, was floated 150 feet above the proposed site, to create a visual mark that would correspond to the top of the proposed 150-foot tower. AT&T's consultants, accompanied by town officials, drove the major public roads within a two mile distance of the site to identify locations where the balloon was (and, therefore, the proposed facility would be) visible. (R. 10-11, 340-341). With assistance from town officials in selecting locations, AT&T's

consultants took photographs from 25 different points using lens settings that would approximate normal human eyesight relative to scale and field of vision and a Global Positioning System, so that each photograph was taken looking towards the balloon. (R. 10).  The 150-foot-high balloon was visible from only five out of the 25 locations. (R. 11).  Photo simulations were then prepared to simulate the appearance of the proposed facility from each of the five locations where the balloon had been visible. (R. 272, 276, 287, 294, and 297).  The photo simulations indicated that, in those few locations in the town where the proposed facility would be visible, only the top of the cell tower would be seen above the surrounding trees.  (*Id.*).

During the September 2010 hearing, the ZBA Chairman and others questioned the accuracy of the balloon test, expressing doubt that the cell tower would not be visible from certain areas within the town, despite what was shown by the photo simulations.  (R. 97-129, 232-235, 253).  In response to these concerns, AT&T first provided a letter from its consulting engineer explaining how the balloon test was conducted and how the photo simulations were prepared, in an effort to ensure that they accurately and reliably reflected the visual impact of the proposed facility.  (R. 324-326, 340-341).  At the November 2010 hearing, the ZBA and some members of the Town Board countered this expert analysis of the aesthetic impacts of the proposed cell tower with subjective, lay information and generalized complaints about the accuracy of the balloon test.  (R. 363-367).  For instance, the Chairman questioned how, if the proposed cell tower required a "line of site" to an area in order to provide effective coverage, the tower could be visible in only a handful of locations and still

effectively remedy AT&T's service gap.  (R. 364).  The Chairman's admitted confusion resulted from his failure (or refusal) to grasp AT&T's prior explanation of "line of site" coverage, which made clear that the wireless transmission from a cell tower could travel through trees, which could reduce the visibility of the tower, but not interfere with the signal.  (R. 228 (wireless signal will travel through trees, but not through obstructions like buildings or the ground)).

The only objective evidence that the ZBA presented to challenge the balloon test were photographs taken by the Chairman that supposedly demonstrated that the test was inaccurate.  (R. 363-364).  One of the Chairman's photographs was taken from the same location as one photograph from the balloon test, on a ridge more than a mile and a half from the proposed facility.  (R. 278, 345-346). The Chairman's photo shows a very large, white, three story barn which sits in an open field, unobstructed by any surrounding woods, about a quarter mile from, and at a lower elevation than, the proposed facility.  (R. 345).  According to the Chairman, who acknowledged no training, education or expertise in the field of photo simulation (other than an stint as a yearbook photographer during his youth), if the barn was visible from the opposite ridge, then the proposed facility should also be visible.  (R. 363-364).

In its March 2011 submission to the ZBA, AT&T provided a detailed explanation for why the Chairman's photos did not undermine the accuracy of the balloon test.  (R. 421-423).  With respect to the photograph of the barn, AT&T pointed out that, merely because one can see a large, three-story white barn in an open field from a mile and a half away on the opposite ridge does not demonstrate that one also

would be able to see the proposed facility, which would be much smaller than a barn (in terms of width and length), and which would be located another quarter of a mile past the barn, across Steed Road, at a substantially different elevation, and in a heavily wooded area.  (*Id*.; R. 365-366, 466-467).  In fact, the balloon test showed that there is a ridge line between the proposed facility and Steed Road which could have been screening the balloon, so that the barn was visible during the balloon test, but the balloon was not.  (R. 70, 100-102, 107, 125, 129).

When AT&T concluded that the ZBA was struggling to interpret and understand the applicant's technical reports, including those relating to the balloon test, AT&T representatives strongly suggested that the ZBA retain a consultant of its own choice (and at the expense of applicant) to provide advice and clarification concerning the technical data in the record. (R. 374, 401; Graham Aff. ¶ 143, 145-147).  The town refused AT&T's offer of further technical assistance.  (R. 402, 563-565); see also Deft.s' Answer ¶ 72, Dkt. No. 10 (admitting that AT&T suggested that the ZBA retain a consultant, and that the ZBA decided not to do so)).

In its written decision, the ZBA explicitly referenced their objections to the validity of the balloon test.[12]  The ZBA's conclusion that, "for a technology that is

---

[12] The written decision references concerns about another photograph taken by the ZBA Chairman which, he believed, demonstrated that AT&T's photo simulation (#11) for the corresponding location was focused, not on the area where the proposed cell tower would be, but 60 degrees in the wrong direction.  AT&T's experts did not believe their photo simulation #11 had the wrong perspective.  (R. 340-341).  In any event, AT&T stressed that neither its consultants, nor the town representatives who participated in the balloon test, could see the balloon from this particular location, so that any inaccuracy in the perspective of the photograph did not change AT&T's position regarding the visibility of the proposed tower.  (R. 112, 340-341, 364-365, 423, 468-469).

reliant upon 'line of sight,' the ability to view the balloons was overwhelmingly and unrealistically absent[,]" reflects the board's continuing misunderstanding that the towns' abundant trees could limit the visibility of a cell tower while not also blocking the wireless signal.

In *Omnipoint Commc'ns, Inc. v. City of White Plains*, the Second Circuit found substantial evidence to support a town board's denial of a permit to construct a cell tower based on concerns about the aesthetics of the project, its impact on property values, and the perceived failure of the applicant to show a good faith consideration of other feasible, but less intrusive sites. 430 F.3d 529. The *White Plains* panel concluded that the town board was permitted to discount the applicant's expert study of the visual impact of the project based on defects in the expert's tests, and to rely on contrary observations about the aesthetics of the proposed facility by experts retained by opponents of the project and "neighbors who know the local terrain and the sightlines of their own homes." *Id.*, 403 F.3d at 533-534.

The applicant in *White Plains* placed a crane of comparable height to the proposed cell facility and then evaluated whether the crane was visible from neighboring residences. The Second Circuit found that defects in the crane test–the absence of any prior notice of the test to the town board or the community, and the failure to consider the visibility of the facility during winter months when the deciduous trees would be bare–allowed the board to discount the expert's conclusions and accept the contrary evidence from neighbors and their experts. *Id.* at 533. In this case, however, AT&T did provide advance notice of the balloon test, and its

consultants were accompanied by representatives of the town during the test.  (R. 325, 340-341).  While most of the photo simulations reflected surrounding trees with full foliage, AT&T did provide a photo simulation of the site from which the cell tower would be most visible–the neighboring Ward property–when the deciduous trees were bare.  (R. 421-422, 444, 465, 483).  Finally, AT&T responded to suggestions of the town with respect to the balloon test protocol, for example, by keeping a technician at the site where the balloon was deployed to ensure that it was freely floating at a height of 150 feet, and not, for example, caught in the surrounding trees.  (R. 366-367).

While some of the criticisms of the AT&T balloon test came from a few neighbors in the Town of Fenton who seemed to have considerable knowledge of the local terrain, there was no supporting expert analysis (as there was in the *White Plains* case), even though AT&T offered to pay for the town to retain its own expert.  While he criticized the balloon test, the ZBA Chairman recognized that subjective complaints about the test were of limited probative value in assessing the visual impact of the proposed cell tower.  (R. 367).[13]  As noted above, at least some of the ZBA's written objections to the balloon test were based on an apparent misapprehension of the "line of sight" wireless technology.  Accordingly, this court concludes that the *White Plains* case is distinguishable from the instant action, and does not support a finding that substantial evidence supported the decision of the Town of Fenton ZBA to ignore the results of the AT&T balloon test and other expert

---

[13] The Chairman of the ZBA stated: "absent a balloon test at all, all you have left is a vivid imagination of individuals like myself and–everybody else in–in town, as to whether they may or may not see [the cell tower] and whether they may or may not object to it . . . ."  (R. 367).

analysis in evaluating the aesthetic impact of the proposed project.[14]  *See, e.g.,*
*T-Mobile Northeast LLC v. Incorporated Village of East Hills*, 779 F. Supp. 2d at 267-
268  (concluding that ZBA's rejection of expert testimony and photo simulations in
favor of photographs submitted by community members was not supported by
substantial evidence of aesthetic impact); *SBA Communications, Inc. v. Zoning Com'n
of Town of Brookfield*, 112 F. Supp. 2d 233, 240-241 (D. Conn. 2000);[15] *Sprint
Spectrum L.P. v. Town of North Stonington*, 12 F. Supp. 2d 247, 254 (D. Conn. 1998)
(holding that the burden was on the Commission to support its basis for disregarding
Sprint's expert report, and it could not rely on speculative concerns of town residents).

**b.**    **Other Objections Regarding Visual Impact**

Based on the ZBA's ongoing skepticism regarding the balloon test results at the
November 2010 hearing, AT&T worked to minimize further the visual impact at the
five identified locations where the top of the proposed cell tower would be visible.
(Graham Aff. ¶ 65).  AT&T proposed using concealment technology to construct the
proposed facility to look like a white pine, consistent in appearance with other trees at
the site.  (R. 420-421 and 430-463).  An expert with over thirty years of experience in
concealment technology–ten years specifically in the wireless industry–performed an

---

[14] As discussed below, *White Plains* is further distinguishable because AT&T fairly
considered numerous other sites and established that there was not a feasible and less intrusive
alternative to their proposed facility.

[15] *Brookfield* held that "although a commission may deny an application because it does
not believe expert testimony, a commission has the burden of supporting its decision not to
believe the expert testimony with substantial evidence in the record."  *Id.*  As in *Brookfield*, the
Town of Fenton ZBA did not support its rejection of AT&T's balloon test with substantial
evidence, but only relied on its own unsubstantiated opinion that the test was inaccurate.

extensive analysis and determined that the proposed site was well-suited to a "monopine" cell tower. (R. 420, 482-484). The expert, Thor Holbek, generated additional photo simulations demonstrating that, if constructed as a monopine, the proposed cell tower would be well-concealed as a wireless communications facility. (R. 441-451). Because of the substantial height of the surrounding trees on the proposed site, no more than the top 30-40% or so of the top of the disguised monopine would be visible at any of the handful of locations where it could be seen at all. (R. 443-448, 483, 488).

There is only one specific complaint about the visual impact of the proposed cell tower in the record, which the ZBA does not even mention in its written denial. Mr. Ward, whose home is about a half-mile from the site, objected to the "Frankenpine . . . sticking out of the middle of the ridge up on top of a hill without another single pine sticking up out of that ridge." (R. 230, 250-251, 487-488). In fact, the photo simulations showed that, from Mr. Ward's property, only the top of the proposed monopine would be visible above the horizon, even when the surrounding deciduous trees are bare. (R. 443-444). In any event, a single neighbor's complaints about the aesthetics of a proposed facility, even if the ZBA made a written record of their reliance on the complaints (which it did not do), do not constitute substantial evidence of an adverse visual impact. *See Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d at 496 (a "few generalized expressions of concern with 'aesthetics' cannot serve as substantial evidence on which the Town could base the denials"). *See also Omnipoint v. Village of Tarrytown*, 302 F. Supp. 2d 205, 216 (S.D.N.Y. 2004) ("[t]he

unsubstantiated concerns of the general public do not constitute substantial evidence"); *Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d at 558 ("[p]ublic officials are supposed to carry out the mandate of the TCA and state law in the face of community opposition").

Despite AT&T's willingness to address Mr. Ward's initial concerns by the use of concealment technology, at significant additional expense, and the expert's efforts to demonstrate how it would disguise the proposed facility, the ZBA's written decision stated, in conclusory fashion, that the monopine "would have a negative visual impact regardless of any attempt at concealment."  (R. 565).[16]  Although aesthetic impacts may be a reasonable basis for denying an application for a wireless communications facility, such a denial must be based on more than just unsupported opinion.  *See, e.g.*, *New York SMSA Ltd. Partnership v. Village of Floral Park Bd. of Trustees*, 2011 WL 4375668, at *9-10 ("Viewing the record in its entirety, the Court finds that the Board's denial on the grounds that the Facility is 'not in keeping with the overall characteristics of the Village,' which ignored the expert testimony, technical reports, and data concluding that the Facility would blend in with and not negatively impact the property values of the surrounding neighborhood . . ., and which

---

[16] Curiously, at the end of the April 2011 hearing, the ZBA issued a negative SEQRA declaration, finding that the proposed facility had no negative environmental impact–a finding that typically takes into account any adverse visual impact of the project.  (R. 494-495).  *See, e.g., T-Mobile Northeast LLC v. Town of Ramapo*, 701 F. Supp. 2d 446, 459, 462 (S.D.N.Y. 2009) (the Planning Board's negative SEQRA declaration reflected findings of a minimal visual impact and undermined the Board's later conclusion that the tower would be an "eyesore"); *Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d at 549, 557 (Planning Board's negative SEQRA declaration included a finding that the project would not impair the character of the community's aesthetic resources).

relied solely on generalized objections and the fact that there is only one other existing telecommunications facility in the Village, is not supported by substantial evidence."); *T-Mobile Northeast LLC v. Incorporated Village of East Hills*, 779 F. Supp. 2d at 268 (given that the ZBA's rejection of the applicant's expert testimony regarding the visual impact of the project was supported only by general aesthetic objections raised by residents who submitted photographs, the ZBA's finding that the project would have a negative aesthetic impact on surrounding areas was not supported by substantial evidence); *T-Mobile Northeast LLC v. Town of Ramapo*, 701 F. Supp. 2d at 460-462 (where there was little support for the Planning Board's conclusion that the proposed cell tower would be an eyesore, other than generalized aesthetic concerns of several residents, its denial of a permit was not supported by substantial evidence) (distinguishing *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d at 533- 535).[17]  In sum, the administrative record clearly demonstrated that AT&T's proposed monopine would cause only a minimal intrusion on the community, and that the ZBA's conclusory finding to the contrary was not supported by substantial evidence.

### D.    Claims Based on New York Law

AT&T also moves for judgment on its supplemental state law claim arising under N.Y.C.P.L.R., Article 78.  Article 78 affords relief from local decisions that are

---

[17] In the *White Plains*, 430 F.3d at 533, the Second Circuit stated: "Given the 150-foot tower would rise to three times the height of the tallest evergreen tree and would be half again as tall as any other tree in the area, the Board could reasonably conclude (especially given express testimony to that effect) that the tower would be widely visible."  As noted above, and as reflected in the photo simulations, the trees surrounding the proposed facility on Steed Road were considerably taller than those referenced in *White Plains*, and only the top of AT&T's proposed monopine would rise above the tree line.

"affected by an error of law," are "arbitrary and capricious," or are not supported by "substantial evidence."  N.Y.C.P.L.R. § 7803(3) and (4).  Although "Article 78 imposes its own requirement that local decisions be supported by substantial evidence" the test for relief from a zoning board's decision under Article 78 " 'is essentially the same as that under the TCA.'"  *T–Mobile Northeast LLC v. Town of Ramapo*, 701 F. Supp. 2d at 461 (quoting *Omnipoint Commc'ns, Inc. v. Common Council of City of Peekskill*, 202 F. Supp. 2d 210, 226 (S.D.N.Y. 2002)).

As discussed above, the applicable substantive standards of New York zoning law require that a applicant for a variance for a proposed telecommunications facility establish "(1) that there are gaps in service, (2) that the location of the proposed facility will remedy those gaps and (3) that the facility presents a minimal intrusion on the community."  *New York SMSA Ltd. Partnership v. Village of Floral Park Bd. of Trustees*, 2011 WL 4375668, at *7 (citations and internal quotation omitted).  As documented above, the ZBA ultimately conceded that plaintiff had established the existence of a gap in AT&T's coverage in the Town of Fenton, and that its proposed, single-site "monopine" tower adequately remedied the coverage gap.  Hence, the only issue in dispute with respect to the claim under New York law is whether the proposed facility caused more than a minimal intrusion on the community.  The court's conclusion, in section II C 3., that there was not substantial evidence in the record to support the ZBA's implied finding that AT&T's proposed "monopine" created a more

than minimal intrusion, similarly entitles AT&T to relief on its state law claim.[18]

## E.   Claims Based on the TCA's Ban on Effective Prohibitions of Service

A municipality is prohibited from making zoning decisions that will have the effect of prohibiting personal wireless services.  47 U.S.C. § 332(c)(7)(B)(i)(II).  "[A] plaintiff will prevail on a Section 332(c)(7)(B)(i)(II) claim if it shows both that a 'significant gap' exists in wireless coverage and that its proposed facility is 'the least intrusive means' to close that gap."  *T-Mobile Northeast LLC v. Town of Ramapo*, 701 F. Supp. 2d at 456 (citing *Sprint Spectrum L.P. v. Willoth*, 176 F.3d at 643).  "A local government may reject an application for construction of a wireless service facility in an under-served area without thereby prohibiting personal wireless services if the service gap can be closed by less intrusive means."  *Sprint Spectrum L.P. v. Willoth*, 176 F.3d at 643.  As examples, the court in *Willoth* suggested that an applicant may be required to pursue a less intrusive alternative by "select[ing] a less sensitive site," "reduc[ing] the tower height," "us[ing] a preexisting structure," or "camoflag[ing] the tower and/or antennae."  *Id.*

The defendants have conceded that AT&T had a substantial coverage gap in the Town of Fenton, and that its proposed Stead Road facility adequately remedied the gap.  Accordingly, the only issue in dispute with respect to the effective prohibition claim is whether AT&T's preferred single site was the least intrusive means of

---

[18] AT&T also claims that the ZBA violated N.Y. Town Law § 267-a(9) because its written denial was not rendered within five business days.  As its counsel argued, the ZBA's failure to meet this statutory deadline does not mandate annulment of its determination.  *Matter of Frank v Zoning Bd. of Town of Yorktown*, 82 A.D.3d 764, 764-65, 917 N.Y.S.2d 697 (2d Dept. 2011).

addressing the coverage gap.  AT&T analyzed, in great detail, every attempt by the ZBA and town residents to identify a less intrusive, but still feasible, alternative to remedy the service gap.  (Graham Aff. ¶¶ 79-89).  Over the course of the nine-month ZBA process, AT&T's radio frequency ("RF") engineers evaluated five single-site alternatives, modifications to AT&T's existing facilities in another town (R. 12-16 and 73-78), and five different two-site alternatives (R. 321-324, 327-338, 423-426 and 470-474).  The ZBA's written decision concedes that none of the single-site alternatives adequately addressed AT&T's coverage gap.  (R. 392, 565).  As noted above, defense counsel has conceded that the two-site alternative preferred by the ZBA Chairman and commended in the ZBA's written decision–the County Tower/ Power Line Site #1 combination–also failed to adequately to remedy the service gap. (See note 10, above; R. 504).

The only viable alternative that provided comparable coverage to AT&T's proposed Steed Road site, was the "solution" involving two separate towers at Power Line Site #1 and Power Line Site #2. (R. 504).[19]  Even if the ZBA were allowed to rely, in this litigation, upon the two-site "Power Line Solution" as a less intrusive alternative, despite its failure to mention that alternative in its written decision, the court finds that ZBA's denial of the use variance effectively prohibited AT&T from

---

[19] A hypothetical alternative involving the proposed facility off of Steed Road and a second tower at a location along Palmer Hill Road provided coverage that exceeded that of the single proposed Steed Road site.  (R. 504).  However, AT&T withdrew its request before the Fenton Town Board for the creation of a telecommunications district on Palmer Hill Road "[i]n the face of substantial public opposition."  (Deft.s' Mem. of Law at 1; R. 244).  Given their objections to the proposed Steed Road site, the ZBA obviously would not have favored a two-site solution including the Steed Road location.

addressing its coverage gap in the Town of Fenton.

### 1.     The Relative Intrusiveness of the "Power Line Solution"

The Power Line Solution would require the construction of two new 150-foot telecommunications towers which, AT&T contended, would have much greater visibility than AT&T's proposed single site.  (R. 425).  In order to demonstrate this point, AT&T commissioned expert Thor Holbek to prepare and explain an evaluation of the potential visual impacts of new 150-foot cell towers at Power Line Site #1[20] and Power Line Site #2.[21]  (R. 425-426, 452-463, 484-486).  Using Google Earth, Mr. Holbek prepared a design study with four simulated views, from surrounding major roadways, of Power Line Sites #1 and #2.  (Graham Aff. ¶ 110; R. 452-463).  In his report, which describes the visibility of both Power Line Sites from each vantage point, Mr. Holbek concluded, "I found both [Power Line Sites] to be very visible and potentially a great negative visual impact on the surrounding vistas of rolling farmland."  (R. 453).  In particular, views of Power Line Site #1 from numerous vantage points in the surrounding community would be unhindered because trees have been cleared from the surrounding area, and there are no ridge lines between it and the surrounding community to conceal it.  (R. 484-485).  Mr. Holbek testified that

---

[20] Power Line Site #1 is located in a river valley almost a mile to the east of the Steed Road site.  The elevation at Power Line Site #1 is approximately 1025 feet, which is 275 feet lower than the elevation at AT&T's proposed site (1300 feet).  (R. 13).

[21] Power Line Site #2 is located in a clearing approximately 0.75 miles northeast of the AT&T's proposed site, between Steed and Richards Roads.  The ground elevation at this location is approximately 1360 feet, about 60 feet higher than the proposed site; and this appears to be the highest terrain in the area.  (R. 14).

screening is similarly limited for Power Line Site #2.  (R. 485-486).

Due to limited screening and a lack of surrounding woods at both Power Line Sites, Mr. Holbek concluded that these alternative facilities not only would be more visible, but also would be difficult to conceal with stealth technology.  In Mr. Holbek's expert opinion, based on his personal visit to the locations and areas nearby, Power Line Site # 1 would be very difficult to conceal.  (R. 484).  In fact, he testified that it is "the worst site as far as visual impact goes."  (R. 485).

During the April 2011 hearing, the ZBA Chairman raised the possibility, of placing a cell tower at Power Line Site #1 to get the benefit of the topography and "numerous singular tall pines if concealment technology were to be used for aesthetic blending."  Mr. Holbek pointed out that, unlike the Steed Road site, the pines trees in this location were only seventy-five to eighty feet tall at best, so that a 150-foot tower in that location (even disguised as a Monopine) would be far more visible than AT&T's proposed facility.  (R. 485).  Notwithstanding the factual information contradicting the Chairman's observation at the hearing, the ZBA's written decision repeated that the "singular tall pines" at Power Line Site #1 would facilitate the use of "concealment technology" for "aesthetic blending."  (R. 565).

During the April 2011 hearing, and in its written decision, the ZBA criticized Mr. Holbek's analysis because it relied on Google Earth, as opposed to "the actual topographical features of the area . . .".  (R. 484-486, 489, 565).  However, Mr. Holbek testified that he confirmed findings based on Google Earth by visiting the relevant sites.  (R. 484-485).  Based on the authority cited in Section II C 3 a., above,

32

the ZBA's subjective, lay concerns about the accuracy of Mr. Holbek's expert conclusions would not constitute substantial evidence supporting a conclusion that the Power Line Solution had a lesser visual impact than AT&T's proposed single site.

In touting the Power Line Solution, defense counsel suggests that the two proposed towers would blend into existing utility infrastructure because the cell towers would be in close proximity to the power transmission lines.  (Deft.s' Mem. of Law at 16; *see also* R. 371 (Chairman:  "[The Power Line Sites a]re on power lines. There's already clutter there anyway."), 487).  However, the administrative record demonstrates the town's own Zoning Code requires telecommunications facilities to be set back from all utilities at least 1.5 times the height of the proposed structure. (R. 488; Town of Fenton Zoning Code § 150-20.6(A)).  Therefore, the two new 150-foot towers would have to be located at least 225 feet from power lines themselves, preventing the new towers from "blending in" and, instead, creating two entirely new, intrusive features to the landscape.

As discussed in section II C 3 b., above, AT&T's proposed "monopine" at the Steed Road site presented a minimal intrusion to the surrounding community.  By contrast, AT&T presented evidence that the two-site Power Line Solution would have a dramatically greater visual impact, which opponents of the Steed Road site countered with only subjective, lay opinions.  Even if the ZBA had properly supported its written denial of the use variance by finding the two-site Power Line Solution was a less intrusive alternative than AT&T's single-site proposal, that finding would not be not supported by substantial evidence in the record.

## 2.    Effective Prohibition

Defense counsel argues that the ZBA should have the discretion to make a judgment that, even if two separate cell towers at the Power Line Sites might be more visible than AT&T's proposed single site, they would be less "intrusive" because they were adjacent to power transmission lines that already cluttered the landscape. (Deft.s' Mem. of Law at 8-9).  While Steed Road resident, Mr. Ward, expressed this view during the April 2011 hearing (R. 487), the ZBA did not address the Power Line Solution in its written decision, and did not expressly embrace Mr. Ward's apparent support for this particular two-site alternative during the hearing.  Whether or not a zoning board could find a two-site solution a less intrusive alternative on the facts of this case, the ZBA's denial of AT&T's use variance application constituted an effective prohibition of service, in violation of the TCA, 47 U.S.C. § 332(c)(7)(B)(i)(II).

The ZBA and defense counsel take the position that AT&T could not establish that their proposed site was the least intrusive solution to the coverage gap because AT&T did not seriously consider alternative sites.  (R. 490, 495-496; Deft.s' Mem. of Law at 9).  The record clearly indicates, however, that AT&T reasonably evaluated no fewer than eleven different alternatives, in an effort to satisfy the ZBA's torturous search for some different, feasible solution to the coverage gap.  AT&T reasonably declined to explore the possibility of leasing most of these alternative sites, because its analysis indicated they would not adequately address the service gap.  However, AT&T agents preliminarily explored the availability of several key alternative

34

sites–the County Tower site and Power Line Site #2–and it conceded that AT&T presumably could lease Power Line Site #1 from the State of New York, which owned that property.  (R. 495-496).  *See, e.g.*, *New York SMSA Ltd. Partnership v. Village of Floral Park Bd. of Trustees*, 2011 WL 4375668, at *18 (Verizon made a good faith effort to evaluate alternative sites, one of which was properly rejected because it did not adequately address the service deficiency in the town); *New York SMSA L.P. v. Town of Oyster Bay Zoning Bd. of Appeals*, No. 08–CV–4833, 2010 WL 3937277, at *6 (E.D.N.Y. Sept. 30, 2010) (The board presented no evidence that other sites were appropriate substitutes for the proposed property, and Verizon met its burden of investigating alternatives and presented credible evidence regarding the infeasibility of the sites).[22]

As a result of the ZBA's denial of the use variance for the Steed Road site, AT&T's only apparent alternative for addressing its service gap in the Town of Fenton would be to start over in developing and presenting an application for a use variance relating to the two-site Power Line Solution.  Assuming that AT&T could negotiate suitable leases with the landowners at the two Power Line Sites, the process would take many months, if not several more years, before a decision on the variance application would be rendered.

---

[22] In *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d at 536, the Second Circuit concluded that, because an applicants made only conclusory statements that other potential sites for co-location on existing towers were not feasible, there was substantial evidence supporting the town board's decision that were other feasible alternatives.  The *White Plains* case is distinguishable from the instant case, because AT&T's documentation of its reasons for rejecting alternative sites, including possible co-location sites, was detailed and cogent.

AT&T would, as the ZBA Chairman acknowledged at the April 2011 hearing, face new opposition from neighbors and others who might be affected by the more visible cell towers at the two new sites.  (R. 498).  Moreover, the fate of AT&T's new application would be decided by the Town of Fenton ZBA, the Chairman of which explicitly supported a different two-site solution, even though it did not adequately address the service gap.  AT&T would be forced into advancing a "solution" involving two separate cell towers after it had taken and extensively documented the position that it could adequately address the service gap with a single cell tower. Based on the Second Circuit authority that a multi-site solution may be rejected when the coverage gap can be addressed with fewer cell towers, and given that the ZBA never formally endorsed the Power Line Solution, the ZBA would have compelling grounds for rejecting a use variance for the two-site facility.  *See Sprint Spectrum L.P. v. Willoth*, 176 F.3d at 643 ("A local government may . . . reject an application that seeks permission to construct more towers than the minimum required to provide wireless telephone services in a given area.")

One might argue that AT&T would be somewhat paranoid to worry that the ZBA would reject a use variance for the Power Line Solution when it has indicated at least a tentative preference for that, or a similar two-site alternatives.  However, during the three hearings, various comments by the ZBA provided AT&T with considerable reason to suspect that the board members were motivated by a "not in my backyard" mentality, and would be inclined to deny any use variance for a cell tower

36

in the Town of Fenton, if at all possible.[23]   *See T-Mobile Northeast LLC v. Incorporated Village of East Hills*, 779 F. Supp. 2d at 274 (the zoning board's denial of T-Mobile's application to install cellular telephone antennae "is a classic example of the 'Not In My Backyard' attitude that is all too prevalent in the manner in which some municipalities consider these applications and precisely the reason that Congress was compelled to enact the TCA").[24]

In essence, the ZBA's denial of AT&T's use variance in this case has left the plaintiff "whipsawed," in the untenable position of advocating a alternative, two-site solution to its coverage gap that is likely to generate considerable additional delay and then, ultimately fail.  Under these circumstances, ZBA's denial amounts to an effective prohibition of service under the TCA.  *See, e.g., Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d at 556, 560 ("The ZBA's denial of T-Mobile's application has left T-Mobile with no feasible means of filling the gap, short of building a new tower that it cannot build under existing Town Law–and if it could

---

[23] *See, e.g.*, R. 253 (Chairman suggesting the service gap might be better handled by another tower in neighboring Chenango County or elsewhere), 369 (Chairman joking that there are more cows than people in Chenango County, and both species might not care about a cell tower there), 375 (Chairman speculating that alternative, less intrusive sites might be available elsewhere), 379 (Chairman suggesting several alternative sites in other towns), 383 (Chairman proposing that AT&T get "creative" in considering alternatives, *e.g.*, in a neighboring town).

[24] As a result of the tortured history of its efforts to win approval of the proposed facility, first from the Town Board, and then from the ZBA, AT&T reasonably perceived a general hostility towards the placement of its cell towers in the Town of Fenton.  The Town Board, a political body which may properly rely on generalized community opposition, has apparently never approved any Telecommunications Zoning District, although there have apparently been only two applications.  (R. 247-248; Pltf.'s Mem. of Law at 3-4, 23-24; Deft.s' Mem. of Law at 13).  The ZBA's obvious reluctance to issue a variance that would be inconsistent with the apparent will of the Town Board, validated AT&T's perception of a pervasive hostility to cell-tower development in the Town of Fenton.  (R. 247, 490, 565).

build such a tower, it would take years to seek and receive the necessary permits and approvals."); *Nextel Partners, Inc. v. Town of Amherst*, 251 F. Supp. 2d 1187, 1196 (W.D.N.Y. 2003) (the ZBA's denial of Nextel's application to co-locate its facility on the existing tower of a competitor, coupled with a town moratorium that would prevent it from building its own tower, has left Nextel with no alternative means of filling the coverage gap in the town and clearly has the effect of prohibiting wireless service under the TCA.).

### F. Appropriate Remedies

AT&T has requested that the court declare that the ZBA's denial of its variance application violated the TCA, that it overturn and vacate the ZBA's denial pursuant to N.Y.C.P.L.R., Article 78, and that it order "the defendants to immediately approve the Variance and allow AT&T to construct and operate the Proposed Facility at the Site and grant and issue any and all other permits as may be required by AT&T to place, construct and operate the Proposed Facility at the Site."  (Pltf.'s Mem. of Law at 47).

The TCA does not specifically provide a remedy for violations of the various provisions of section 332(c)(7).  "But at least for violations of the substantial evidence provision, 47 U.S.C. § 332(c)(7)(B)(iii), almost all courts to address the question have held that 'the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits.'"  *T–Mobile Northeast LLC v. Town of Ramapo*, 701 F. Supp. 2d at 463 (quoting *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d at 497 (collecting cases)).  "Moreover, under *Willoth*, a violation of the effective prohibition provision, 47 U.S.C. § 332(c)(7)(B)(i)(II), requires injunctive relief:  an application proposing

38

the "least intrusive means for closing a significant [coverage] gap" cannot be denied–or, put differently, it must be granted.  *Id.* (citing *Sprint Spectrum L.P. v. Willoth*, 176 F.3d at 643).

At oral argument, counsel for the Town of Fenton stated that, if the court were to find in favor of AT&T, it would be preferable if AT&T were required to seek approval of a special use permit and site plan by the town Planning Board before it commenced the proposed project.  While defense counsel did not anticipate that AT&T would have any problems obtaining the approval of the Planning Board, the court finds the more definitive injunctive relief requested by AT&T is appropriate. *See, e.g., Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d at 497 (after finding that the Town Board violated the TCA by denying applicant's request for special permits, the district court properly refused the Town's request to remand the matter for compliance with remaining local procedures, including review of the site plan by the Town Planning Board); *Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d at 562 (rejecting the Town's request that injunctive relief be limited to ordering the ZBA to issue a variance, finding that "[r]emand to the Planning Board would be both futile and inappropriate").[25]

---

[25] The proper defendant in this case is the Town of Fenton.  The court is not limited in granting injunctive relief by the fact that other component agencies of the town, such as the Planning Board, were not specifically named as defendants.  *See, e.g., Omnipoint Commc's, Inc. v. Town of LaGrange*, 658 F. Supp. 2d at 552 (under New York law, departments that are merely administrative arms of a municipality have no separate legal identity apart from the municipality); *T–Mobile Northeast LLC v. Town of Ramapo*, 701 F. Supp. 2d at 463 n.5 (an injunction that issues against the Town of Ramapo also binds its administrative arms-including its Planning Board).

## III.   CONCLUSIONS

For the reasons discussed above, the court finds in favor of plaintiff on all claims.  Accordingly, the court hereby:

1.      **DECLARES** that the defendants, in denying plaintiff's zoning use variance, violated the Telecommunications Act of 1996 ("TCA"), 42 U.S.C., §§ 332(c)(7)(B)(iii), because the reasons for the denial in the Zoning Board of Appeal's written decision were not supported by substantial evidence in the administrative record;

2.      **DECLARES** that the defendants, in denying plaintiff's zoning use variance, violated the TCA, 42 U.S.C., § 332(c)(7)(B)(i)(II), by effectively prohibiting plaintiff from providing wireless telecommunications services to a significant portion of the Town of Fenton and surrounding areas;

3.      **DECLARES** that the defendants, in denying plaintiff's zoning use variance, violated N.Y.C.P.L.R., Article 78, and **ORDERS** that Zoning Board of Appeal's denial be **VACATED**;

4.      **ORDERS** that the defendants promptly approve plaintiff's zoning use variance and grant and issue any and all other permits as may be required by plaintiff to place, construct and operate and allow plaintiff to construct and operate the proposed facility at the proposed site; and

5.      **ORDERS** that the court will retain jurisdiction until such time as all required permits have been issued to plaintiff for the placement, construction, and

operation of the proposed facility at the proposed site.


Dated:  January 4, 2012


Hon. Andrew T. Baxter
U.S.  Magistrate Judge